1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

TRAVELERS CASUALTY AND
SURETY COMPANY,

                    Plaintiff,

          vs.

WASHINGTON TRUST BANK,

                    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No.  CV-13-0409-JLQ

MEMORANDUM OPINION
AND ORDER RE:
SUMMARY JUDGMENT MOTIONS

          BEFORE THE COURT are Defendant Bank's Motion for Summary Judgment
(ECF No. 88), Plaintiff Traveler's Motion for Partial Summary Judgment (ECF No. 82),
and Bank's Motion to Strike supporting evidentiary materials (ECF No. 120).  The court
heard oral argument on the matter on January 20, 2015.  Mark Wilson argued the Motions
for Plaintiff.   Local counsel Bruce Medeiros also appeared for Plaintiff.   Leslie
Weatherhead  argued on behalf of Defendant.  Geana Van Dessel also appeared for
Defendant.  This Order memorializes and supplements the oral rulings of the court.

**I.  Introduction/Procedural History**

          This action was filed on December 9, 2013.  Travelers filed a First Amended
Complaint on December 11, 2013. (ECF No. 5).  Bank moved to dismiss the First
Amended Complaint and that Motion was denied.  Travelers then sought and was granted
leave to file a Second Amended Complaint ("SAC") (ECF No. 42).  The SAC is the
operative  pleading.   Bank  filed  a  Third-Party  Complaint  against  Skils'Kin, Inc..
Skils'Kin appeared and moved to dismiss the Third-Party Complaint.  After hearing

ORDER - 1

1    argument, the court granted the Motion to Dismiss Third-Party Complaint. <u>See</u> Order at

2    ECF No. 66.

3        This matter was originally set for jury trial on January 20, 2015.  At the parties

4    request the trial and pretrial dates were stricken.  The parties sought additional time to

5    fully develop the summary judgment record, evaluate the court's ruling prior to trial, and

6    discuss settlement. <u>See</u> Stipulated Motion to Amend Scheduling Order at ECF No. 75.

7    As claims remain for trial, the court resets the pretrial and trial dates.

8        **II.  <u>Factual Background</u>**

9        The court herein recites the basic Factual Background and will reference additional

10   pertinent facts in its discussion of the legal issues.  The parties have filed a Stipulation

11   (ECF No. 69) as to certain facts.  Each side has also filed a Statement of Facts in support

12   of its Motion, and the parties have filed Response and Reply briefs.

13        Plaintiff, Travelers Casualty and Surety Company ("Travelers" or "Plaintiff"

14   herein), issued a policy of insurance to Skils'Kin, a community-based, not-for-profit,

15   agency with offices located in Spokane, Washington.  Skils'Kin provides services to

16   adults with developmental, physical, and mental disabilities, including money

17   management services. (ECF No. 69, ¶ 4-5).   Skils'Kin is appointed by the Social

18   Security Administration as the "representative payee" for many of its clients. (*Id.* at ¶ 6).

19   Skils'Kin is also authorized to act as representative payee by its clients who signed an

20   agreement specifically acknowledging and appointing Skils'Kin as agent and

21   representative payee. (Bank S of F[1] #9).

22        Skils'Kin managed the monthly income and living expenses of approximately

23   1,000 clients acting as representative payee.  Skils'Kin was allowed by the Social

24   Security Administration to charge a fee for this service and did charge each client a

25   monthly fee of approximately $38.00.  Skils'Kin maintained a single business checking

27        [1]S of F refers to Statement of Facts.  The Bank's Statement of Facts is at ECF No. 89.

28   ORDER - 2

account at Bank. (Bank S of F #10-12).  The average monthly balance in this account ranged from $166,876.47 to $510,224.60 during the period of January 2010 to February 2013. (Bank S of F #14).

Shannon Patterson was a Skils'Kin employee, Payee Services Coordinator, and a signatory on the bank account.  In 2009 Patterson was promoted to Payee Manager, and in March 2010 to Director of Payee Services.  (Bank S of F #15 & 17).  Patterson engaged in a several year embezzlement in which she presented checks at Bank that were made payable to  Skils'Kin clients, and signed by Patterson for Skils'Kin as the payor. Patterson cashed and kept the money from over 300 such checks.  Although the payees on the checks were Skils'Kin clients, Patterson signed the back of the checks with her own name when the checks were cashed.  Bank contends this was an indorsement.[2] Bank contends the checks were signed pursuant to an oral agreement between Bank and Patterson.  Bank contends Patterson was authorized by Corporate Resolution to make such agreements.  Bank further contends that although the procedure was a departure from standard practice, it was an accommodation.  Bank employees testified concerning reasons why Patterson was allowed to cash checks made payable to Skils'Kin clients - - that some Skils'Kin clients were homebound, were disruptive when they were in the bank, and/or did not have proper identification.  Teller Nicki Atha testified that Deb Carlson, a branch manger, gave her approval to allow Patterson to sign the back of checks and receive the  cash.  Other bank tellers also cashed checks for Patterson.  Some tellers testified that this did not comply with the Bank's standard procedures.

Travelers contends Patterson signed the back of the checks only to signify that cash was received, and that her signature was not an indorsement or "unauthorized signature" within the meaning of the Uniform Commercial Code ("U.C.C.").  Skils'Kin CEO Brian

---

[2]"Indorse" and "Endorse" are both acceptable spellings.  "**I**ndorse" is the spelling used in Washington statutes concerning negotiable instruments. See for example RCW 62A.3-204.

Behler avers that Patterson had no authority to cash the checks. (ECF No. 83).

Patterson's fraud went undetected from sometime in late-2008 until February 2013. In February 2013, Patterson committed suicide and admitted to the fraud in a suicide note(s). After the fraud was discovered, Skils'Kin made a claim under its fidelity insurance policy to Travelers. Travelers paid the claim, and brought this action as the subrogee and assignee of Skils'Kin.

## III. **The Claims**

The SAC claims that the Bank, in disregard of reasonable commercial standards and its duty to exercise ordinary care, cashed checks for Patterson, even though Patterson was not the named payee and the named payee had not endorsed the checks. (SAC at ECF No. 42, ¶ 7). Travelers contends the checks were not "properly payable" under RCW 62A.4-401(a) because they were not indorsed by the payee. Travelers further contends that Patterson signed the backs of the checks "to acknowledge receipt for cash from the Bank rather than for the purposes of negotiating the checks", and that Patterson's signature was not an "unauthorized signature" under RCW 62A.1-201(b)(41). Travelers claims that Skils'Kin "had no way of discovering these improper payments from reviewing [Bank] statements" because the statements did not include copies of the back sides of the checks. (ECF No. 42, ¶ 12).

## IV. **Standard of Review**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994). The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). While the moving party does not have to disprove matters on which the opponent bears the burden of proof at trial, they nonetheless bear the burden of producing evidence

ORDER - 4

that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that no genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of evidence to support the nonmoving party's case. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. *Id*.

Although a summary judgment motion is to be granted with caution, it is not a disfavored remedy: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(citations and quotations omitted).

**V.  Discussion**

**A.  Travelers' Arguments for Partial Summary Judgment**

Travelers seeks to have the court rule on a series of discrete legal issues, including ruling on several of Bank's affirmative defenses. Such rulings would not be dispositive of the case. Travelers argues that the case is "about bad banking practices", and that Bank behaved recklessly and improperly. (ECF No. 82, p. 4). Travelers argues that the court should conclude, as a matter of law, that Bank did not comply with reasonable standards of banking. Travelers contends the Bank could not agree to deviate from reasonable commercial standards through the alleged agreement between branch manager, Debbi Carlson, and Patterson to allow Patterson to cash checks made payable to third-party payees. Travelers further argues that Patterson had no authority to enter into

ORDER - 5

such an agreement.

As to the Bank's asserted defenses, Travelers asserts that Skils'Kin had "no duty to discover and report the Bank's improper payments". (ECF No. 82, p. 16).  Travelers also argues that the Bank did not make the items (processed checks) reasonably available because Bank provided copies of only the front of the checks with the monthly statements.

**B.  Bank's Arguments for Summary Judgment**

Bank argues that both under the applicable statute, RCW 62A.4-406, and pursuant to its banking agreement with Skils'Kin, Skils'Kin was required to examine the monthly banking statements and to report unauthorized signatures or alterations within 60 days.  Bank argues that it provided monthly statements which listed the checks paid by number, date, and dollar amount and included copies of the face of each check. (ECF No. 88, p. 6).  Having providing this information, Bank contends Skils'Kin allowed the fraudulent activity of Patterson to continue for over four years.  Bank contends  Skils'Kin could have easily identified Patterson's unauthorized activity by looking at the backs of the checks on-line, calling the Bank's customer service number to obtain copies of the checks, or through other internal accounting measures.  Bank contends it first received notice of Patterson's fraudulent activities in a letter dated March 1, 2013, which only specifically identified two checks - - one from October 2012, the other from February 2013. (ECF No. 88, p. 13).

Bank also argues  the checks at issue were properly payable because Patterson was an agent of Skils'Kin and Skils'Kin was an authorized agent of its client payees.  Bank further contends that the checks were cashed in accordance with an agreement between Patterson, as representative of Skils'Kin, and Bank.

**C.  Whether U.C.C. 4-406 Bars Travelers Claims**

The primary focus at oral argument was on the Bank's defense under RCW 62A.4-406,  (hereafter "4-406") and Travelers' contention that 4-406 does not apply because

ORDER - 6

Travelers' claim does not rely on the assertion of check alterations or unauthorized signature on the checks.  The central issue to be determined on summary judgment is whether section 4-406 bars Travelers' claims.  The Bank agrees that if 4-406 does not preclude the Plaintiff's claims, there are then questions of reasonableness that should be determined by the trier of fact. (See Bank's Response, ECF No. 109, p. 1, 3)("...the Court need not reach the negligence claim which cannot be resolved on motion for summary judgment;" and "Travelers' claim that Bank failed to exercise ordinary care is disputed and cannot be resolved without a trial.").  Travelers disagrees and argues that the court should determine as a matter of law that Bank's practices violated commercial standards.

The resolution of whether 4-406 bars Travelers' claims requires the determination of numerous sub-issues: 1) were the checks at issue "properly payable"?; 2) did Bank make the "items" available to the customer in a manner which allowed Skils'Kin to identify the items paid per 4-406(a)?; 3) did Skils'Kin exercise reasonable promptness in examining statements and notifying Bank under 4-406(c)?; 4) if Skils'Kin failed to timely report the loss, did Bank fail to exercise ordinary care such that the loss should be allocated?; and finally, 5) does subsection 4-406(f) apply "without regard to care or lack of care of either the customer or the bank" to preclude a customer from asserting against a bank any claim even though not based upon "any unauthorized signature, indorsement, or alteration" not brought to the bank's attention within one year?

**1. Were the Checks Properly Payable?**

RCW 62A.4-401(a) provides: "A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft.  An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank."  The checks at issue were made payable to Skils'Kin' clients as payees, and signed on the front by Patterson, an authorized signatory on the Skils'Kin account. The parties agree Patterson was not a named payee on any of the checks and the named payees did not indorse any

ORDER - 7

of the checks over to Patterson. (ECf No. 69, ¶ 10-11).  The checks, on their face, were payable to third-party payees, but not to Patterson.

Bank argues that they were properly payable "in accordance with any agreement between the customer and bank".  The Bank argues it had an oral agreement with Patterson to allow her to cash checks for clients because the clients were disabled, homebound, disruptive, or otherwise unable to come into the Bank.  Bank argues Patterson was authorized to make this agreement on behalf of Skils'Kin because of a Corporate Resolution dated October 1, 2009 making Patterson, as Payee Service Manager, an authorized signer on the account with the power to indorse checks and make withdrawals.  The Resolution also provided that: "Any of the persons named below, so long as they act in a representative capacity as agents of the corporation, are authorized to make any and all other contracts, agreements, stipulations and orders which they may deem advisable for the effective exercise of the powers indicated...". (ECF 86-9 at p. A431).

Travelers argues that Skils'Kin did not give Patterson such authority and that Patterson was certainly not acting on behalf of Skils'Kin when she was fraudulently embezzling funds.  There is a factual dispute as to whether there was an agreement between Patterson and Bank.  Patterson cashed checks with several different tellers. Karin Selland, a teller, averred that generally "tellers are not permitted to cash a check for someone if the check is payable to the order of someone else," and that she was not aware of an agreement allowing Patterson to do so. (ECF No. 85).  However, Bank employees  Emily Burgess and Nicki Atha testified that they were generally aware of such an agreement.  Nicki Atha testified that Deb Carlson, a Bank branch manager, told her that Patterson was a representative of Skils'Kin, and had authority to complete the transaction in such manner, and that there was an agreement allowing Patterson to indorse checks for Skils'Kin clients. (ECF 110-3).  However, Deb Carlson testified that she could not recall ever discussing with Shannon Patterson a request for special handling of

ORDER - 8

Skils'Kin checks.  She did not recall cashing checks for Patterson, or in any instance cashing checks for a person who signed the back of check but was not the named payee. (ECF No. 86-10).

Neither party contends  there was a written agreement allowing the unusual check cashing procedure. There is a disputed question of fact as to the existence of an oral agreement.  If there was no agreement, the checks were clearly, from the face of the checks, not payable to the order of Patterson, and it could be argued that Skils'Kin had no duty to report the erroneous procedure. <u>See for example</u> *Deljack v. U.S. Bank*, 2012 WL 4482049 (D.Idaho 2012)(customer had no duty to report bank's failure to honor restrictive endorsement as bank was "in the first and best position to discover the problem"); *Elden v. Merrill Lynch*, 2011 WL 1236141, *8 (S.D.N.Y. 2011)("Numerous cases establish that a bank does not act in a commercially reasonable manner when it pays check lacking any indorsement whatsoever.").  Travelers also argues that even if it could be proven that there was an agreement between Patterson and Bank, such an agreement was unenforceable as a matter of law under the U.C.C.  Travelers relies on Sections 1-302 and 4-103, which provide in part that although U.C.C. provisions can be varied by agreement, obligations of good faith and reasonableness may not be disclaimed.  Further, the variations must not be "manifestly unreasonable."  The court does not find as a matter of law, based on the current state of the record, that the alleged agreement between Bank and Patterson was manifestly unreasonable.  Reasonableness determinations should typically be left for the jury.

There are questions of fact as to whether it was reasonable for the Bank to pay the checks in the manner it did, and also questions of fact as to whether there was even an agreement between Carlson and Patterson regardless of the efficacy thereof.  The factual issue is created by the unusual circumstances of this case, where Skils'Kin provided money management services to disabled clients and was appointed by the Social Security Administration as a "representative payee" for those clients. Patterson was the Director

ORDER - 9

of Payee Services and the drawor on the checks.  Tellers testified as to reasons why they believed Patterson was allowed to cash the checks for the disabled clients: payee clients were disabled and homebound, payee clients were disruptive when in the bank, and payee clients lacked proper identification.  Under certain factual circumstances, it may be decided as a matter of law that cashing a check with a missing indorsement, or indorsed by someone other than the payee, is commercially unreasonable as a matter of law.  See for example, *Elden*, cited supra; *Govoni & Sons v. Mechanics Bank*, 51 Mass.App.Ct. 35 (2001).  However, the determination in this case presents issues of fact.  In addition to the disputed facts concerning the alleged agreement to allow Patterson to cash the checks, each side has retained an expert witness.  The Bank's retained expert, John Bley, opines that it was reasonable for the Bank to assume that Skils'Kin had adequate internal controls and thus it was also reasonable for Bank to alter its check cashing procedures as an accommodation to Skils'Kin. (ECF No. 110-2).  The court finds questions of fact exist precluding a summary determination as to whether the Bank acted in a commercially reasonable manner and whether the checks were paid pursuant to an agreement between Skils'Kin and Bank.

 2.  **Did Bank make the "Items" Reasonably Available Under 4-406(a)?**

 Assuming that the Bank acted reasonably in paying out the checks, and thus Skils'Kin had a duty to report that the payments were improper, did the Bank make the checks available in a sufficient manner to allow discovery of the error?  Section 4-406(a) provides in part: "The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.  If the bank does not return the items paid or copies of items paid, it shall provide in the statement of account the telephone number that the customer may call to request an item or copy."  It is undisputed that Bank provided Skils'Kin with monthly statements.  These statements included checks that had cleared in the previous month and identified them by item number, date, and amount of check.  The statements also included copies of the front, but not the back,

ORDER - 10

of each check.  The Bank statements contained in the upper-right hand corner the following: "For assistance, call PRIORITY SERVICE 1-800-788-4578." Beginning in January 2011, Skils'Kin had 24-hour/day online access to its checking account. This electronic online access allowed Skils'Kin to view the front and back of each check that cleared its account.

Whether the Bank made the items reasonably available remains a question of fact as is the issue of whether Skils'Kin could have discovered the fraud by Patterson if it had examined the backs of the checks either on-line, or by requesting copies of the backs of the checks via telephone.  Skils'Kin claims that the statements did not specifically state to call the 1-800 number to request copies of items.  Additionally, Skils'Kin claims the 1-800 number went to an automated menu and that none of the menu prompts offered the option of ordering copies of cancelled checks.  Bank responds by stating that by simply responding to two prompts: 1) calling about business banking; 2) calling about checking account; the caller would be transferred to a live person and could have requested copies.

Travelers refers to the Declaration of Skils'Kin Accounting Manager Nicolle Laporte. (ECF No. 103).  She claims to have "diligently" reconciled the monthly bank statements "every month" by looking through the copies of the fronts of the checks.  She claims the on-line access was "cumbersome".  She admits it did allow review of the back of checks.  Laporte describes in detail selecting an account, clicking on a link for front of check, clicking link for back of check, closing check, selecting another check, etc. (ECF No. 103, ¶ 3).  In today's electronic age such activities are commonplace, and these actions would appear to only take a few seconds.  The Bank contended at oral argument that once the account statement is made available it is the customer's duty to examine it with reasonable promptness. 4-406(c).  If Laporte, and Skils'Kin, chose not to examine the electronic statements, that does not mean, as a matter of law, that the information was not available to be examined.  A leading treatise on the U.C.C. finds electronic access to "fully satisfy" the 4-406(a) requirement. See White, Summers, & Hillman, Uniform

ORDER - 11

Commercial Code, § 1938 (6th ed. 2014)("We see no reason why a listing of these checks and the debits to the account together with digital images of checks would not fully satisfy the "statement of account" requirement in 4-406(a)."). In the matter, *sub judice*, only the front of the checks were shown on the paper account statements, but images of both the front and back of the checks were available online.

Laporte claimed the phone number on the statement was not specifically identified as one to call to obtain cancelled checks and that if called, one reached an automated menu. (ECF No. 84, ¶¶ 9-10). Arguably, if one wishes to obtain information from the Bank, one calls the 1-800 Priority Service number listed on the statement.

**3) Did Skils'Kin exercise reasonable promptness in examining statements and notifying Bank under 4-406(c)?**

Section 4-406(c) requires a customer to "exercise reasonable promptness in examining the statement or items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized." The Declarations of Laporte establish that she reviewed the statements monthly and did not discover any irregularities.

"If, based on the statements or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts." 4-406(c). The statements did not alert Skils'Kin to the unauthorized payment, because only Patterson's signature on the back of the checks may have alerted Skils'kin. As Skils'kin contends that cashing the checks for Patterson, when she was not the named payee was so clearly improper, it can be argued that Skils'Kin would have discovered the problem had it found the signature of Patterson on the back of any of the approximately 300 checks.

Skils'Kin did not discover the problem until Patterson disclosed her theft in a suicide note. Skils'Kin CEO Brian Behler stated that he learned of Patterson's suicide on February 12, 2013, and "Skils'Kin immediately notified the Bank that day of the

ORDER - 12

fraudulent checks". (ECF No. 101, ¶ 2). He then went to the Indiana Branch of Bank with CFO Ken Brown on February 13, 2013. On March 1, 2013, Skils'Kin lawyer sent a letter to Bank concerning the fraud, and that letter specifically mentioned two checks. On April 15, 2013, Skils'Kin's lawyer sent a spreadsheet reporting an additional 286 checks that were improperly paid between August 13, 2010 and February 8, 2013. In a pre-litigation letter dated July 23, 2013, counsel for the Bank, different counsel than is representing the Bank in this litigation, sent a letter containing his analysis of the claim that 288 checks were improperly paid. (ECF No. 101, p. 11). He concluded that 171 of the checks were barred by the 1-year "absolute bar" of 4-406(f). He also argued that all the remaining checks were barred under what he called the "bank statement rule," also known as the "serial wrongdoer" concept.

Patterson's fraud occurred over a four year period and was never detected by Skils'Kin. Skils'Kin most likely would have discovered the unauthorized payment by examining the backs of the Checks. However, questions of fact remain concerning the reasonableness of the Banks' actions and whether Skils'Kin had any duty to report the improper payments. See for example *Ford Motor Credit Co. v. United Services*, 1972 WL 20865 (N.Y.City Civ.Ct. 1972)("there is no notice [customer] could have given at any time that would have been superior to that derived from even a cursory examination of the instrument by [Bank's] employees"); *Seaman Corp. v. Binghamton Savings Bank*, 220 A.D.2d 62 (N.Y.App. 1996)(4-406 does not impose on customer duty to inspect for missing indorsements); *Deljack, Inc. v. U.S. Bank*, 2012 WL 4482049 (D.Idaho 2012)(Bank was in "first and best position" to discover its failure to honor a restrictive indorsement and thus customer did not have duty to notify).

**4) If Skils'Kin failed to timely report the loss, did Bank fail to exercise ordinary care such that the loss should be allocated?**

If a bank customer has failed in its duty to inspect and report, but "the customer proves the bank failed to exercise ordinary care in paying the item and that failure

ORDER - 13

substantially contributed to the loss, the loss is allocated" between the bank and customer according to the extent to which each contributed to the loss. 4-406(e).  Whether a bank has exercised ordinary care presents a question of fact. See for example *Govoni & Sons v. Mechanics Bank*, 51 Mass.App.Ct. 35 (2001); *Fidata Trust Co. v. Community First Saving and Loan*, 946 F.2d 898 (9th Cir. 1991)(whether bank acted in commercially reasonable manner was mixed question of law and fact); *Parsons Travel, Inc. v. Hoag*, 18 Wash.App. 588 (1977)(whether bank was negligent in cashing forged checks was a question of fact).  However, such question may sometimes be determined as a matter of law. *Govoni & Sons*, 51 Mass.App.Ct. 35 (2001).  The *Govoni & Sons* court referenced several cases and other authorities finding the following conduct to be clearly unreasonable: payment of checks with missing indorsements; failure to respect restrictive indorsements; failure to inquire into authority of one purporting to be an agent; payment of check with irregular or incorrect indorsement; honoring check with visibly altered payee name; and allowing deposit of check indorsed by corporate payee into a personal account. *Id*. at 1103.

A customer can establish lack of ordinary care by showing that the bank's procedures were below standard, or that the bank's employees failed to exercise ordinary care. Assoc. Home and RV Sales v. Bank of Belen, 294 P.3d 1276, 1284 (N.M. App. 2012).  Here, there is clearly a question of fact as to whether the Bank exercised ordinary care.  Bank teller Karin Selland stated that the Bank had "mandatory teller procedures" and that "tellers are not permitted to cash a check for someone if the check is payable to the order of someone else" unless the check is indorsed over to the individual presenting the check for cash. (ECF No. 85).  Ms. Selland was not aware of any special agreement or procedure allowing Patterson to cash checks in violation of the Bank's "mandatory teller procedures." *Id*.  Another teller, Helen Jarrell testified that cashing checks without the payee's indorsement did not comply with the Bank's written procedures. (ECF No. 110-4).  Bank employee Janeen VanSlyke testified that allowing Patterson to indorse the

ORDER - 14

checks went "against the bank's standard written procedures," but that it was done as an "accommodation". However, there are also facts from which a jury could find that Bank acted reasonably, including the expert testimony of John Bley, as discussed, *supra*.

There is evidence from which the trier of fact could find the Bank did not follow reasonable commercial standards. If it is so determined, one possibility is for the court to allocate the loss. <u>See for example</u> *Fackrell v. American Nat.Bank*, 116 P.3d 201 (Ok.App. 2005)(allocating 70% fault to bank for allowing withdrawal with missing signature even though customer did not examine statements for nearly 10 years).

**5) Does subsection 4-406(f) apply "without regard to care or lack of care of either the customer or the bank" to preclude a customer from asserting a claim against a bank for unauthorized signature, indorsement, or alteration not brought to the bank's attention within one year?**

Section 4-406(f) provides:

(f) Without regard to care or lack of care of either the customer or the bank, a natural person whose account is primarily for personal, family, or household purposes who does not within one year, and any other customer who does not within sixty days, from the time the statement and items are made available to the customer (subsection (a)) discover and report the customer's unauthorized signature or any alteration on the face or back of the item or does not within one year from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration. If there is a preclusion under this subsection, the payor bank may not recover for breach of warranty under RCW 62A.4-208 with respect to the unauthorized signature or alteration to which the preclusion applies.

Travelers argues that 4-406(f) does not preclude its claims because the statute serves to preclude a customer from "asserting against the bank such unauthorized signature or indorsement or such alteration." Travelers argues 4-406(f) protects a bank from paying a check that appeared properly payable, and the customer did not alert the bank to the forgery or alteration. Travelers contends 4-406(f) does not give a bank "safe harbor for paying checks that do not even facially appear to be properly payable."

ORDER - 15

(ECF No. 106, p. 6).

Travelers' states that this is a "missing indorsement" case and not a case of an "unauthorized signature." Some courts have found that a "missing" signature is an "unauthorized" signature. See for example *Fackrell v. American Nat. Bank*, 116 P.3d 201 (Ok.App. 2005); *Security State Bank v. Visiting Nurse Assoc.*, 256 Ga.App. 374 (Ga.App. 2002). However, there is authority to the contrary. See for example *Seaman Corp. v. Binghampton Savings Bank*, 220 A.D.2d 62 (N.Y.App. 1996)("UCC 4-406 does not apply, on its face, to missing indorsements"). Bank argues that the presumption is that Patterson's signature on the back of the check is an indorsement. Bank cites to RCW 62A.3-204, which provides in part, "...but regardless of the intent of the signer, a signature and its accompanying words is an indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for purpose other than indorsement." One could argue that Patterson's signature was unambiguously not an indorsement because she was not the named payee and could not indorse the check. Travelers argues Patterson signed as a receipt for cash. Patterson's intent in signing the checks may never be conclusively established now that she is deceased.

Travelers also argues that the 4-406 defense is inapplicable because the Bank did not act in good faith in paying the Checks. Travelers cites cases in support of this argument and relies primarily on *Falk v. Northern Trust Co.*, 763 N.E.2d 380, 387 (Ill.App. 2001). (ECF No. 106, p. 14). Although *Falk* supports Travelers argument, other courts have disagreed. See for example *Environmental Equip. v. Wachovia Bank*, 741 F.Supp.2d 705, 718-19 (E.D.Pa. 2010). On this disputed factual record, it is for the jury to determine if the Bank acted in good faith. Additionally, Travelers has argued that the Bank failed to follow commercial standards, which is distinct from acting in bad faith. See *Absolute Drug Detection Serv. v. Regions Bank*, 116 So.3d 1162, 1168 (Al. App. 2012)("...[bank teller's] conduct, at most, demonstrated that she may have

ORDER - 16

failed to exercise ordinary care in conducting everyday business; her actions certainly did not rise to the level of bad faith..").  Secondly, 4-406(e) specifically states: "If the customer proves that the bank did not pay the item in good faith, the preclusion under subsection (d) does not apply."  Thus, if the Bank did not act in good faith it could not assert 4-406(d).  The statute does not specifically state that the 4-406(f) one-year time-bar defense is eliminated by a lack of good faith.

Numerous questions of fact, as set forth herein, preclude the court from making a determination on summary judgment that 4-406 applies.  It appears that even if 4-406(f) were applied, not all the claims would be time-barred.  In Assoc. Home and RV Sales v. Bank of Belen, 294 P.3d 1276, 1284 (N.M. App. 2012), the court found that even though the case involved a serial wrongdoer (check forger) the customer could recover on claims occurring within one year if it could prove lack of ordinary care on the part of the bank.  According to Bank's then attorney in the pre-suit letter, 117 of the Checks are within 1-year of providing notice to the Bank of Patterson's fraudulent conduct.

**D.  Ratification**

As an additional argument for summary judgment, Bank contends that Skils'Kin ratified all of Patterson's fraudulent activity. (ECF No. 88).  Bank contends that on February 13, 2013, the CFO of Skils'Kin, Ken Brown, signed the Bank's form Corporate Authorization Resolution, which stated in pertinent part:

> All transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of this corporation with this Financial Institution prior to the adoption of this resolution are hereby ratified, approved and confirmed.

(ECF No. 90-4).  Skils'Kin argues it did not ratify Patterson's fraudulent conduct. Brown filed a Declaration (ECF No. 102) stating that the purpose of the Resolution was to make him an authorized signer on the account.  He further stated he was not authorized to ratify Patterson's fraudulent activity.  Further, Skils'Kin, at that time,  did

ORDER - 17

not have knowledge of the full scope of Patterson's fraud.

The Bank's ratification argument carries very little weight with the court. Brown had just learned, less than 24-hours prior to signing the Bank's form Resolution, that long-time employee, Patterson, had committed suicide. In the suicide note, he first learned of her fraudulent activities. It is not reasonable that Brown would intentionally ratify Patterson's unlawful activities, and Brown did not have full knowledge of her activities at the time the Resolution was signed. Generally a party must act voluntarily and with full knowledge of the facts in order to ratify a contract or transaction. It appears Brown was at the Bank on February 13, 2013 to do the exact opposite of ratifying Patterson's actions - - he was there to report they were improper. His Declaration states that on the way to the Bank he talked with a Bank employee about what was required to make him an authorized signer on the account, and that when he arrived he was presented with the Bank's form and told he needed to sign it to become an authorized signer. As stated *supra*, Brown also avers that he was not authorized to ratify, did not understand the form to have that effect, and was not aware of the scope of Patterson's fraud when he signed the form. (ECF No. 102).

At a minimum, there are questions of fact as to whether Brown ratified the past fraudulent transactions of Patterson and Bank is not entitled to summary judgment on the theory of ratification.

**E. Breach of Customer Agreement**

The Bank makes an argument similar to its 4-406 contention, but based on the Customer Agreement (at ECF No. 90-1, Dec. of Van Slyke, p. 24). The Agreement is arguably broader than 4-406 in that it requires a customer to report "errors" on a statement, in addition to alterations and unauthorized signatures. The Agreement further states that if errors are not reported in 60 days, "you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours." The Agreement further states that the 60-day limitation is without

ORDER - 18

regard to whether the Bank used ordinary care.  The provision concerning examination of statements provides:

> **STATEMENTS** - You must examine your statement of account with "reasonable promptness."  If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts.  As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.
>
> You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.
>
> Your further agree that if you fail to report any unauthorized signatures, alterations, forgeries, or any other errors in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours.  This 60-day limitation is without regard to whether we used ordinary care.

This language in the Agreement seeks to shorten the 1-year period in 4-406(f) to 60 days.  Parties are allowed to alter various UCC provisions by Agreement, but cannot "disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for lack of failure." RCW 62A.4-103.  Thus language stating the 60-day limitation applies "without regard to whether we [the Bank] used ordinary care" is unenforceable.   Additionally, as the 4-406(f) one-year time limitation applies "without regard to care or lack of care of either the customer or the bank", an attempt to shorten the one-year period to 60 days in effect attempts to limits a bank's responsibility for failure to exercise ordinary care.

The court is not aware of any Washington case law discussing whether shortening

ORDER - 19

the one-year time period in 4-406 by agreement is permissible.  Courts in some states have upheld such agreements.  <u>See for example</u> *Absolute Drug Detection v. Regions Bank*, 116 So.3d 1162 (Al.App. 2012)(allowing bank's deposit agreement to shorten 406(f) claim bar period to 30 days); *ADC Rig Serv. v. JPMorgan Chase*, 641 F.Supp.2d 671 (S.D. Tex 2009)(account agreement shortened 406(f) period to 30 days); *Security State Bank v. Visiting Nurses Assoc*., 256 Ga.App. 374 (Ga.App. 2002).

The court agrees that the scope of the Agreement is broader than 4-406.  The Agreement speaks of a duty to report "any other errors" and prohibits a "claim against us on any items in that statement".  Section 4-406(f) speaks of alterations and unauthorized signatures and precludes a customer from asserting "against the bank such unauthorized signature or indorsement or such alteration." RCW 62A.4-406(f). The parties have not presented the court with any controlling authority on this question, and at this stage the court is not inclined to allow the Bank to shorten the 1-year period of 4-406(f) to 60 days based on its Customer Agreement.  The court will reserve on this issue and the parties may address it further in motions in limine and trial briefing.

**F. Presentment Warranty**

Bank argues that if it is held to be liable to Skils'Kin, then Patterson is liable to Bank for breach of presentment warranty under RCW 62A.3-417.  Bank argues that Patterson represented she had authority to cash the checks and claims that is further evidenced by her signing the back of the checks.  Bank argues that as Patterson was a representative of Skils'Kin, Bank could seek to recover from Skils'Kin for breach of presentment warranty.  Travelers argues that any such claim would be against Patterson individually and not Skils'Kin.

The court agrees with Travelers.  The Bank's argument is circular.  If a jury determines that Bank acted in a commercially unreasonable manner in paying Patterson for checks on which she was not the named payee and were not properly payable, any

ORDER - 20

claim that Bank would have for breach of presentment warranty would be against Patterson only and not Skils'Kin or Travelers.  Travelers also contends that Bank was required to give notice of any presentment warranty claim "within 30 days" under RCW62A.3-417, and failed to do so.  Travelers is entitled to summary judgment on this defense.

### G.  Bank's Motion to Strike

Concurrently with its Reply Brief, Bank filed a Motion to Strike (ECF No. 120) seeking to strike portions of the Romney and Laporte declarations.  Bank contends that Romney is offering an expert opinion without being disclosed as an expert, and that Laporte has offered testimony that contradicts a prior stipulation.  Travelers' Response (ECF No. 130) states that Romney is a forensic accountant and Bank received the report she prepared after Skils'Kin discovered the fraud.  Bank took her deposition, and she is listed as a trial witness by Bank.  Under those facts, there is no prejudice to offering her opinion at summary judgment.  Travelers further states that Romney is not offering expert opinion testimony in the Declaration, but rather describing her factual investigation.

As to the Laporte Declaration, Bank believes it is an attempt to subvert a stipulation that: "In its usual course of business, Skils'Kin has documents in substantially the same form as..[refers to docs by Bates numbers]..referring to that client as the person for whom Skils'Kin is the representative payee, and signed by the client." (ECF No. 69, ¶ 7). The documents referenced in the Stipulation were not attached to the Stipulation, nor were they attached to Bank's Motion to Strike.  These documents are in the summary judgment record at ECF No. 91-1.  The documents concern Skils'Kin clients authorizing Skils'Kin to act as an "agent/payee".  Apparently the Bank wants it determined that all Skils'Kin clients signed these documents agreeing to allow Skils'kin to "use my benefits for my best interests".

The Second Declaration of Laporte states that she "conducted a random

ORDER - 21

sampling of client files," and reviewed 13 of the 107 "payees who were clients." She discovered that 2 of those 13 had not signed the representative payee agreement. This is of little probative value, and the Bank would have had no knowledge of this fact at the time the checks were cashed.

The Motion to Strike is DENIED. Both Romney and Laporte have been disclosed as trial witnesses and the court will consider their Declarations and accord them appropriate evidentiary value, if any.

**VI.  Conclusion**

Numerous disputes of material fact remain which preclude summary judgment. A reasonable juror could find that Bank failed to exercise ordinary care and failed to follow reasonable commercial standards in allowing Patterson to cash the checks. A reasonable juror could also find that Skils'Kin failed to exercise reasonable care in examining its monthly statements, failed to timely notify Bank, and in so doing allowed the fraud to continue for over four years.

Both the Customer Agreement and 4-406(e) allow for allocation of loss when both the customer and the Bank have failed to exercise ordinary care. Such may well be appropriate in this case. At the conclusion of the hearing, the court encouraged the parties to engage in settlement discussions and/or mediation. This case presents complex factual and legal issues and a dearth of controlling legal authority. Thus the parties could continue to pursue it through trial and on appeal, with an ensuing lack of certainty for several years. An agreed resolution, which resolves the matter without months or years of additional litigation expenses, may be in the best interests of the parties.

**IT IS HEREBY ORDERED**:

1.  Defendant Bank's Motion for Summary Judgment (ECF No. 88) is **DENIED**.

2.  Plaintiff Travelers' Motion for Partial Summary Judgment (ECF No. 82) is

ORDER - 22

**DENIED**, except as to the Presentment Warranty defense which is **GRANTED.**

3. Bank's Motion to Strike (ECF No. 120) is **DENIED**. The court did expedite hearing on the Motion to Strike, and therefore the Motion to Expedite (ECF No. 128) is **GRANTED**.

4. Exhibit lists shall be filed and served and exhibits made available for inspection (or copies provided) on or before **July 2, 2015.** The exhibits shall not be filed. Objections to exhibits shall be filed and served on or before **July 13, 2015**, and shall be heard at the pretrial conference. All exhibits shall be pre-marked: Plaintiff shall use numbers 1-499; Defendant shall use numbers 500-*et seq.*

5. Designation of substantive, as opposed to impeachment, deposition testimony of witnesses who will be unavailable to give live testimony at trial, shall be by highlighting in blue and served, **not filed**, on or before **July 2, 2015.** Cross-designations by highlighting in yellow shall be served, **not filed**, on or before **July 16, 2015**. Objections to any designated deposition testimony shall be **filed and served** on or before **July 24, 2015** , and shall be heard at the pretrial conference.

6. All unresolved substantive or evidentiary issues which may foreseeably arise during trial shall be addressed by motions in limine to be served and filed not later than **May 25, 2015**, and shall be heard and resolved at the pretrial conference.

7. Trial briefs, proposed jury instructions, and requested jury voir dire shall be filed and served on or before **July 8, 2015.**

8. The pretrial conference will be held in Spokane, Washington **on Friday, July 31, 2015 at 9:00 a.m.** All unresolved motions and objections will be heard at the pretrial conference. If an agreed pretrial order has been lodged, counsel need not appear at the pretrial conference unless unresolved motions or objections exist.

9. The jury trial shall commence at 9:00 a.m., on **Monday, August 10, 2015**, in Spokane, Washington.

**IT IS SO ORDERED**. The Clerk shall file this Order and furnish copies to

ORDER - 23

counsel.

Dated this 5th day of February, 2015.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 24